## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MATTHEW JACOBSON, Derivatively on Behalf of Nominal Defendant VIEW, INC., <br><br>            Plaintiff, <br><br> v. <br><br> RAO MULPURI, NIGEL GORMLY, HAROLD HUGHES, TOM LEPPERT, TOBY COSGROVE, LISA PICARD, and JULIE LARSON-GREEN, <br><br>            Defendants, <br> And, <br><br> VIEW, INC., <br><br>            Nominal Defendant. | Case No.: <br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Matthew Jacobson ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant View, Inc. ("View" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' breaches of fiduciary duties and violations of federal law. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by View with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed

by View's directors and officers in their management and control of the Company from November 30, 2020 to the present ("Relevant Period").

2.      View is a technology company that manufactures smart building products that are purportedly designed to improve people's health, productivity, and experience while reducing energy consumption.  The Company's primary product is a proprietary electrochromic or "smart" glass panel that, in combination with the Company's proprietary network and software, intelligently adjusts in response to the sun by tinting from clear to dark states, thereby reducing heat and glare.

3.      CF Finance Acquisition Corp. II ("CF II") was a special purpose acquisition company sponsored by Cantor Fitzgerald and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.

4.      On March 8, 2021, CF II and View combined via a Business Combination with View as the surviving, public entity.

5.      On August 16, 2021, View announced that it "began an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual."

6.      On this news, the Company's share price fell $1.26, or over 24%, to close at $3.92 per share on August 17, 2021.

7.      On November 9, 2021, the Director Defendants caused the Company to file a Form 8-K with the SEC announcing the results of its investigation first reported on August 16, 2021, and stated that:

> [T]he following financial statements of the Company should no longer be relied upon and will require restatement: (a) the audited consolidated financial statements of View Operating Corporation (formerly known as View, Inc.) as of December 31, 2020 and 2019, and for the years then ended, (b) the unaudited condensed

consolidated financial statements of View Operating Corporation as of September 30, 2020 and December 31, 2019, and for the nine months ended September 30, 2020 and 2019, (c) the unaudited pro forma condensed combined financial information of the Company as of December 31, 2020, and for the nine months then ended and for the twelve months ended March 31, 2020, and as of September 30, 2020 and for the six months then ended, and (d) the unaudited condensed consolidated financial statements of the Company as of March 31, 2021 and December 31, 2020 and for the three months ended March 31, 2021 and 2020.

8.      The Company made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Company failed to disclose to the market that: (i) it had not properly accrued warranty costs related to its product; (ii) there was a material weakness in its internal controls over accounting and financial reporting related to warranty accrual; (3) as a result, its financial results for prior periods were misstated; and (4) as a result of the foregoing, its positive statements about its business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint alleges a violation of federal law.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

4.      Plaintiff purchased shares of View stock and continues to hold his View stock currently.

**Nominal Defendant**

5.      Nominal Defendant View is incorporated under the laws of Delaware with its principal executive offices located in Milpitas, California.  View's Class A common stock trades on the NASDAQ exchange under the symbol "VIEW."

**Director Defendants**

6.      *Defendant Rao Mulrpuri* ("Mulpuri") has served the Company's Chief Executive Officer ("CEO") since December 2008 and as a director of the Company at all relevant times.

7.      *Defendant Nigel Gormly* ("Gormly") has been a member of the Board since August 2015.  Defendant Gormly is a member of the Company's Audit Committee and Nominating and Corporate Governance Committee.

8.      *Defendant Harold Hughes* ("Hughes") has been a member of the Board since 2013.   Defendant Hughes is the Chairperson of the Audit Committee and a member of the Compensation Committee.  On November 8, 2021, Hughes was appointed as Executive Chair of the Company.  Defendant Hughes will assist the Chief Executive Officer.  As Executive Chair, Defendant Hughes is an employee of the Company and also function as the Company's principal executive officer and Board Chair.

9.      *Defendant Tom Leppert* ("Leppert") has been a member of the Board since 2015.  Defendant Leppert is a member of the Company's Audit Committee and Nominating and Corporate Governance Committee.

10.     **Defendant Toby Cosgrove** ("Cosgrove") has been a member of the Board since approximately March 8, 2021.  Defendant Cosgrove is a member of the Company's Compensation Committee and Nominating and Corporate Governance Committee.

11.     **Defendant Lisa Picard** ("Picard") has been a member of the Board since approximately June 14, 2021.  Defendant Picard is a member of the Company's Compensation Committee.

12.     **Defendant Julie Larson-Green** ("Larson-Greene") has been a member of the Board since June 2021.  On June 10, 2021, the Board, upon the recommendation of the Nominating and Corporate Governance Committee, appointed Larson-Green to the Board.  Larson-Green will serve until the 2022 annual meeting of stockholders and until her respective successor is duly elected and qualified, or until her earlier resignation, death or removal.

13.     Defendants Mulpuri, Gormly, Hughes, Leppert, Cosgrove, Picard and Larson-Greene are herein referred to as the "Director Defendants."  Because of their positions with the Company, they possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Director Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Director Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Director Defendants are liable for the false statements pleaded herein.

5

**Officer Defendants**

14.    ***Defendant Vidul Prakash*** ("Prakash") was the Company's Chief Financial Officer ("CFO") at all relevant times.

15.    The Director Defendants and Defendant Prakash are collectively referred to herein as "Defendants".

## THE AUDIT COMMITTEE CHARTER

16.    The Audit Committee's responsibilities include:

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of View, Inc. (the "Company") is to assist the Board in overseeing and monitoring: (i) ***the Company's accounting and financial reporting processes; (ii) the quality and integrity of the Company's financial statements and the auditing of those financial statements***; (iii) compliance with legal and regulatory requirements; (iv) the Company's independent registered public accounting firm's qualifications and independence; (v) the design and implementation of the Company's internal audit function, if applicable; and (vi) the appointment, compensation, retention, oversight and performance of the Company's independent registered public accounting firm. The Committee shall also perform such further functions as may be consistent with this Charter or assigned by applicable law, the Company's certificate of incorporation or bylaws or the Board.

\*\*\*

## IV.    DUTIES AND RESPONSIBILITIES OF THE COMMITTEE

In carrying out its duties and responsibilities, the Committee's policies and procedures should remain flexible, so that it may be in a position to best address, react or respond to changing circumstances or conditions.

The following duties and responsibilities are within the authority of the Committee, and the Committee shall perform such duties consistent with and subject to applicable law and rules and regulations promulgated by the SEC, Nasdaq, or any other applicable regulatory authority:

A.    Selection, Evaluation and Oversight of the Independent Auditors

The Committee shall have the following duties and responsibilities with respect to the engagement of independent registered public accounting firms:

(a)     Be directly responsible for the appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and each such registered public accounting firm must report directly to the Committee.

(b)     Review and approve the Independent Auditor's annual engagement letter, including the proposed fees contained therein, as well as all audit and permitted non-audit engagements and relationships between the Company and the Independent Auditor (which approval should be made after receiving input from the Company's management, if desired).  Approval of audit and permitted non-audit services will be made by the Committee. The Committee also may delegate pre-approval authority to one or more of its members, who shall report any pre-approval decisions to the Committee at its next regularly scheduled meeting.

(c)     Review the performance of the Independent Auditor, including the lead partner of the Independent Auditor, and, in its sole discretion (subject, if applicable, to shareholder ratification), make decisions regarding the replacement or termination of the Independent Auditor when circumstances warrant.

(d)     At least annually, obtain and review a report from the Independent Auditor describing (i) the Independent Auditor's internal quality-control procedures and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the Independent Auditor, or by any inquiry or investigation by governmental or professional authorities within the preceding five years, respecting one or more independent audits carried out by the Independent Auditor, and any steps taken to deal with any such issues.

(e) Evaluate the Independent Auditor's independence by, among other things:

    (i)     obtaining from the Independent Auditor and reviewing written statements and communications relating to relationships between the Independent Auditor and the Company required by applicable auditing standards of the Public Company Accounting Oversight Board (the "PCAOB") and SEC rules;

    (ii)     engaging in a dialogue with the Independent Auditor with respect to any disclosed relationships or services that may impact its objectivity and independence;

    (iii)     taking, or recommending that the Board take, appropriate actions to oversee the independence of the Independent Auditor;

    (iv)     monitoring the Independent Auditor's compliance with the audit partner rotation requirements contained in applicable SEC rules;

(v) monitoring compliance by the Company of the employee conflict of interest requirements contained in applicable SEC rules; and (vi) engaging in a dialogue with the Independent Auditor to confirm that audit partner compensation is consistent with applicable SEC rules.

B.     Oversight of Annual Audit and Quarterly Reviews

The Committee shall have the following duties and responsibilities with respect to the Company's annual audit and quarterly reviews:

(a)   ***Review and discuss with the Independent Auditor its annual audit plan, including the timing and scope of audit activities, and monitor such plan's progress and results during the year***.

(b)   Review with management, the Independent Auditor and the head of the Company's internal audit function, if applicable, the following:

(i)     ***all critical accounting policies and practices to be used***;
(ii)    any critical audit matters arising from the current period audit;
(iii)   all alternative treatments of financial information that the Independent Auditor has discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Independent Auditor;
(iv)    all other material written communications between the Independent Auditor and management, such as any management letter and any schedule of unadjusted differences; and
(v)     any material financial arrangements of the Company which do not appear on the financial statements of the Company.

(c)   Resolve all disagreements between the Independent Auditor and management regarding financial reporting.

C.     Oversight of the Financial Reporting Process and Internal Controls

The Committee shall have the following duties and responsibilities with respect to the Company's financial reporting process and internal controls:

(a)   Review:

(i)     the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Company's internal audit function, if applicable, through inquiry and discussions with the Independent Auditor, management and the head of the Company's internal audit function; and

(ii)    the yearly report prepared by management, and attested to by the Independent Auditor, assessing the effectiveness of the Company's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Company's Annual Report on Form 10-K.

(b)    Review periodically with the Chief Executive Officer, Chief Financial Officer and the Independent Auditor:

(i)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(ii)    any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control

(c)    Discuss guidelines and policies governing the process by which senior management of the Company and the relevant departments of the Company, including the internal audit function, assess and manage the Company's exposure to risk, as well as the Company's major litigation and financial risk exposures and the steps management has taken to monitor and control such exposures.

(d)    Review and discuss with the Independent Auditor the results of the year-end audit of the Company, including any comments or recommendations of the Independent Auditor, and, based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the Company's financial statements should be included in the Annual Report on Form 10-K.

(e)    Review the type and presentation of information to be included in the Company's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Company to analysts and rating agencies (which review may be done generally (e.g., discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance).

## SUBSTANTIVE ALLEGATIONS

17.     The Company is an American glass-manufacturing company that produces a smart glass based on electrochromism.

18.     CF II was a special purpose acquisition company sponsored by Cantor Fitzgerald and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

19.     On November 30, 2020, CF II and the Company announced that they had entered into a definitive merger agreement in a press release:

> View, Inc. ("View"), a Silicon Valley-based smart window company, and CF Finance Acquisition Corp. II (Nasdaq: CFII) ("CF II"), a special purpose acquisition company sponsored by Cantor Fitzgerald, today announced they have entered into a definitive merger agreement. The combined company will be called View, Inc. and will be publicly listed on the NASDAQ market following the close of the transaction.
>
> *   *   *
>
> **Transaction Details**
>
> The Board of Directors of each of View and CF Finance Acquisition Corp. II have unanimously approved the transaction. The transaction will require the approval of the stockholders of CF Finance Acquisition Corp. II and View, and is subject to other customary closing conditions, including the receipt of certain regulatory approvals. The transaction is expected to close in the first quarter of 2021. Assuming no redemptions by CF II stockholders, the transaction is expected to deliver up to $800 million of gross proceeds including the contribution of up to $500 million of cash held in CFII's trust account from its initial public offering. The transaction is further supported by a $300 million private investment in public equity ("PIPE") at $10.00 per share.
>
> All cash remaining in CF II at the closing after paying off transaction expenses and CF II liabilities is expected to be used to retire debt and to add cash to View's balance sheet for working capital, growth capex and other general corporate purposes.

20.     On December 23, 2020, CF II filed its Registration Statement on Form S-4 (the "Registration Statement") in connection with the Business Combination. The Registration Statement reported that View recorded a one-time warranty accrual of $24.5 million during the nine months ended September 30, 2019 and that the Company's cost of revenue decreased year over-year during the nine months ended September 30, 2020.  The Registration Statement stated:

> Cost of revenue decreased by $44.2 million or 32.5%, from $136.0 million in the nine months ended September 30, 2019, to $91.8 million in the nine months ended September 30, 2020. The decrease in the cost of revenue was primarily related to three factors: (a) a one-time warranty accrual of $24.5 million during the nine months ended September 30, 2019 related to faulty materials from one of our suppliers used in the manufacturing of IGUs, (b) a $16.9 million decrease in customer support expense, consisting of a $5.9 million decrease in customer support expenses due to cost reductions efforts and an $11.0 million decrease in customer support expenses due to a re-allocation of resources from cost of revenue to selling, general, and administrative expenses, and (c) a decrease in production cost of $2.3 million, consisting of a decrease in our inventory valuation provision of $14.2 million relating to the production of certain standard inventory units considered excess and obsolete in the nine months ended September 30, 2019, offset by an increase of $11.9 million due to change in the mix of our products manufactured to satisfy customer orders.

21.     The Registration Statement also reported the following financial results:

*Comparison of the nine months ended September 30, 2020 and 2019*

The following table sets forth our historical operating results for the periods indicated (in thousands, except percentages):

| | Nine Months Ended September 30, | | Change | % Change |
|---|---|---|---|---|
| | 2020 | 2019 | | |
| Revenue | $  24,539 | $  12,534 | $ 12,005 | 95.8% |
| Costs and expenses: | | | | |
| Cost of revenue | 91,825 | 135,998 | (44,173) | (32.5)% |
| Research and development | 50,344 | 56,709 | (6,365) | (11.2)% |
| Selling, general, and administrative | 62,835 | 54,743 | 8,092 | 14.8% |
| Total costs and expenses | 205,004 | 247,450 | (42,446) | (17.2)% |
| Loss from operations | (180,465) | (234,916) | 54,451 | (23.2)% |
| Interest and other income (expense), net: | | | | |
| Interest income | 501 | 4,825 | (4,324) | (89.6)% |
| Interest expense | (19,191) | (5,951) | (13,240) | 222.5% |
| Other expense | (109) | (49) | (60) | 122.4% |
| (Loss) gain on fair value change | (2,296) | 1,750 | (4,046) | (231.2)% |
| Interest and other income (expense), net | (21,095) | 575 | (21,670) | * |
| Loss before provision of income taxes | (201,560) | (234,381) | 32,781 | (14.0)% |
| Provision for income taxes | (137) | (40) | (97) | 242.5% |
| Net loss | $(201,697) | $(234,381) | $ 32,684 | (13.9)% |

\*    not meaningful

22.     Regarding risks impacting the Company, the Registration Statement stated:

***View may choose to or be compelled to undertake product recalls or take other similar actions, which could adversely affect View's brand image and financial performance***.

\* \* \*

In 2019, View identified a quality issue with certain material purchased from one of its suppliers utilized in the manufacturing of certain IGUs.  View stopped using the affected materials upon identification in 2019.  As of December 31, 2019, View had a low warranty claim rate related to this matter.  View has replaced and expects to continue to replace affected IGUs for the remainder of the period covered by the warranty.  View analyzed the risk of failure of the affected IGUs by analyzing failure rate as a function of time required for the IGU to fail since it was installed, and the geographical region where the IGU was ultimately installed.  Based on this analysis.  View estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the TGUs.   The estimated cost includes View's expectations regarding future reductions in production costs.   Based on its analysis, View recognized $24.5 million of expense for the estimated future cost to replace defective IGUs classified in cost of revenue in View's consolidated statement of comprehensive loss for the year ended December 31, 2019.   View recognized a corresponding warranty liability of $1.6 million in other current liabilities and $22.9 million in other liabilities on its consolidated balance sheet as of December 31, 2019.  Considering the limited failure rate data available to-date, and the uncertainty inherent in the failure analysis and the projected costs to replace defective IGUs in future years, the actual timing, number of defective IGUs, and amount of costs to be incurred to replace the defective IGUs could be materially different from the estimate.  There was no significant change in the warranty accrual in the nine months ended September 30, 2020.  [Emphasis added].

23.     The Registration Statement further stated that the Company's "warranty reserves

***may*** be insufficient to cover future warranty claims":

View's current and future warranty reserves may be insufficient to cover future warranty claims which could adversely affect its financial performance. If View's warranty reserves are inadequate to cover future warranty claims on its products, its business, prospects, financial condition and operating results could be materially and adversely affected.  View evaluates warranty reserves on an ongoing basis and record liabilities for matters in which losses are probable and the amount of loss can be reasonably estimated. In 2019, View identified a quality issue with certain material purchased from one of its suppliers utilized in the manufacturing of certain IGUs. View stopped using the affected materials upon identification in 2019. As of December 31, 2019, View had a low warranty claim rate related to this matter.

View has replaced and expects to continue to replace affected IGUs for the remainder of the period covered by the warranty. View analyzed the risk of failure of the affected IGUs by analyzing failure rate as a function of time required for the IGU to fail since it was installed, and the geographical region where the IGU was ultimately installed. Based on this analysis, View estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes View's expectations regarding future reductions in production costs. Based on its analysis,

View recognized $24.5 million of expense for the estimated future cost to replace defective IGUs classified in cost of revenue in View's consolidated statement of comprehensive loss for the year ended December 31, 2019. View recognized a corresponding warranty liability of $1.6 million in other current liabilities and $22.9 million in other liabilities on its consolidated balance sheet as of December 31, 2019. Considering the limited failure rate data available to-date, and the uncertainty inherent in the failure analysis and the projected costs to replace defective IGUs in future years, the actual timing, number of defective IGUs, and amount of costs to be incurred to replace the defective IGUs could be materially different from the estimate. There was no significant change in the warranty accrual in the nine months ended September 30, 2020.

24. The Registration Statement described the Company's warranty policy and accounting as follows:

*Product Warranties*

We provide a standard assurance type warranty that our IGUs will be free from defects in materials and workmanship for 10 years from the date of delivery to customers. IGUs with sloped or laminated glass have a warranty of 5 years. Control systems associated with the sale of IGUs have a 5-year warranty. Management judgment is required to estimate the amount of product warranty accrual. Warranty accruals are based on estimates that are updated on an ongoing basis taking into consideration inputs such as changes in the failure rates, volume of claims compared with our historical experience, and the changes in the cost of servicing warranty claims.

There is uncertainty inherent in the failure rate analysis and the projected costs to replace or repair the defective products in future years, as such we evaluate warranty accruals on an ongoing basis and account for the effect of changes in estimates prospectively.

In 2019, we identified a quality issue with certain material purchased from one of our suppliers utilized in the manufacturing of certain IGUs. The Company stopped using the affected materials upon identification in 2019. As of December 31, 2019, we had a low warranty claim rate related to this matter. We have replaced and

expect to continue to replace affected IGUs for the remainder of the period covered by the warranty. We analyzed the risk of failure of the affected IGUs by analyzing failure rate as a function of time required for the IGU to fail since it was installed, and the geographical region where the IGU was ultimately installed. Based on this analysis, we estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes our expectations regarding future reductions in production costs. Based on our analysis, we recognized $24.5 million of expense for the estimated future cost to replace defective IGUs classified in cost of revenue in our consolidated statement of comprehensive loss for the year ended December 31, 2019. We recognized a corresponding warranty liability of $1.6 million in other current liabilities and $22.9 million in other liabilities on our consolidated balance sheet as of December 31, 2019. Considering the limited failure rate data available to-date, and the uncertainty inherent in the failure analysis and the projected costs to replace defective IGUs in future years, the actual timing, number of defective IGUs, and amount of costs to be incurred to replace the defective IGUs could be materially different from the estimate. There was no significant change in the warranty accrual in the nine months ended September 30, 2020.

25.     On January 26, 2021, CF II filed an amendment to the Registration Statement, which contained substantially similar statements regarding risks related to product warranties as identified above.   It further stated that View recorded a one-time warranty accrual of $24.5 million during the nine months ended September 30, 2019 and that the Company's cost of revenue decreased year-over-year during the nine months ended September 30, 2020:

Cost of revenue decreased by $44.2 million or 32.5%, from $136.0 million in the nine months ended September 30, 2019, to $91.8 million in the nine months ended September 30, 2020. The decrease in the cost of revenue was primarily related to the three following factors:

(a) A one-time warranty accrual of $24.5 million during the nine months ended September 30, 2019 related to faulty materials from one of our suppliers used in the manufacturing of IGUs. In 2019, we identified a quality issue with certain material purchased from one of our suppliers utilized in the manufacturing of certain IGUs. We stopped using the affected materials upon identification in 2019. As of September 30, 2020, we had a low warranty claim rate related to this matter. We have replaced and expect to continue to replace affected IGUs for the remainder of the period covered by the warranty. We analyzed the risk of failure of the affected IGUs by analyzing failure rate as a function of time required for the IGU to fail since it was installed, and the geographical region where the IGU was ultimately installed. Based on this analysis, we estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost

to replace the IGUs. The estimated cost includes our expectations regarding future reductions in production costs which are primarily comprised of materials, labor, and factory overhead. Based on our analysis, we recognized $24.5 million of expense for the estimated future cost to replace defective IGUs classified in cost of revenue in our consolidated statement of comprehensive loss for the nine months ended September 30, 2019. It is reasonably possible that the amount of costs to be incurred to replace the defective IGUs could be materially different from the estimate. Considering the limited failure rate data available to-date and the uncertainty inherent in the failure analysis, including the projected costs to replace defective IGUs in future years, the actual timing of the failures and the number of defective IGUs, we are unable to estimate the amount of any potential additional losses. See section titled Critical Accounting Policies and Estimates – Product Warranties.

(b)      A $16.9 million decrease in customer support expense . . .

(c)      A decrease in production cost of $2.3 million . . .

26.      On February 16, 2021, the Company filed its prospectus on Form 424b3, soliciting stockholder approval for the Business Combination, which contained substantially the same statements as identified above.  The same day, the Registration Statement was declared effective.

27.      On March 15, 2021, the Company issued a press release announcing its fiscal 2020 financial results:

Business highlights are detailed below:

- Full year revenue increased 32.8% y/y to $32.3 million in spite of the impacts of the pandemic
- GAAP loss from operations improved 16.1% y/y; Adjusted EBITDA improved 27.7% y/y
- Completed the announced transaction, raising gross proceeds of $815.2 million resulting in $518.3 million of cash on the balance sheet, after retiring existing debt
- Recent customer announcements include Uber, Dallas Forth Worth International Airport, Tavistock Development Company, Oxford Property Group, Google, Nuveen, and others (see below for more details)

"View exceeded our plan for the full year 2020.  Now in the public markets, we are excited about building on that success," said Dr. Rao Mulpuri, Chairman and CEO of View.  "The company is poised for high growth with a strong balance sheet, exciting product offerings, growing customer base, and accelerating market

adoption. We are well capitalized and excited about the future, as the world looks to build smart buildings that are more sustainable, experiential, and healthier."

28.     On May 12, 2021, the Company issued a press release announcing its first quarter 2021 financial results:

First Quarter 2021 Highlights:

- GAAP revenue of $11.8 million, a 29% increase from Q1 2020 and a 52% increase from Q4 2020.
- GAAP cost of revenue of $29.9 million, a 16% improvement from Q1 2020 and a 5% improvement from Q4 2020 due to production efficiencies.
- GAAP operating expenses of $37.1 million, a 16% improvement from Q1 2020 driven by cost controls, and a 10% increase over Q4 2020 related to growth initiatives and IPO preparations.
- GAAP loss from operations of ($55.1) million, a 22% improvement compared to Q1 2020 and 4% improvement from Q4 2020.
- Non-GAAP Adjusted EBITDA of ($37.8) million, a 31% improvement compared to Q1 2020 reflecting higher revenues, improved factory costs and streamlined operating expenses. Non-GAAP Adjusted EBITDA improvement of 11% over Q4 2020.

29.     On May 17, 2021, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q"), affirming the previously reported financial results.  Regarding product warranties, the Company stated:

**Product Warranties**

The Company provides a standard assurance type warranty that its IGUs will be free from defects in materials and workmanship for generally 10 years from the date of delivery to customers. IGUs with sloped or laminated glass generally have a warranty of 5 years. Control systems associated with the sale of IGUs typically have a 5-year warranty. In resolving warranty claims, the Company generally has the option of either repairing or replacing the covered product. Based on historical experience, the Company accrues for estimated returns of defective products at the time revenue is recognized. The Company monitors warranty obligations and may make revisions to its warranty reserve if actual costs of product repair and replacement are significantly higher or lower than estimated. ***Accruals for anticipated future warranty costs are recorded to cost of revenue in the condensed consolidated statements of comprehensive loss and included in other current liabilities and other liabilities on the condensed consolidated balance sheet***.  Warranty accruals are based on estimates that are updated on an ongoing basis taking into consideration inputs such as changes in the volume of

claims compared with the Company's historical experience, and the changes in the cost of servicing warranty claims. The estimated cost includes the Company's expectations regarding future reductions in production costs which comprise of materials, labor, and factory overhead.  The Company accounts for the effect of such changes in estimates prospectively.

In 2019, the Company identified a quality issue with certain material purchased from one of its suppliers utilized in the manufacturing of certain IGUs. The Company stopped using the affected materials upon identification in 2019. The Company has had a low warranty claim rate to-date related to this matter. The Company has replaced and expects to continue to replace the affected IGUs for the remainder of the period covered by the warranty. The Company analyzed the risk of failure of the affected IGUs by analyzing historical failure rate as a function of time since the IGU installation. Based on this analysis, the Company estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes the Company's expectations regarding future reductions in production costs which comprise of materials, labor, and factory overhead.

***As of March 31, 2021 and December 31, 2020, the warranty liability included in accrued expenses and other current liabilities was $3.8 and $4.0 million and other liabilities was $18.1 million and $18.7 million, respectively, on the condensed consolidated balance sheets. During the three months ended March 31, 2021, the Company recorded a net credit of $0.3 million for the reduction in product warranties and consumption of $0.5 million. During the three months ended March 31, 2020, the Company recognized a warranty expense of $0.5 million and consumption of $0.7 million***.

Unforeseen component failures or exceptional component performance can also result in changes to warranty costs. ***If actual warranty costs differ substantially from the Company's estimates, revisions to the estimated warranty liability would be required, which could have a material adverse effect on the Company's business, financial condition and results of operations***.  [Emphasis added].

30.     The 1Q21 10-Q also stated that the Company had material weaknesses in its internal

control over financial reporting:

We did not design or maintain an effective internal control environment that meets our accounting and reporting requirements.  Specifically, we did not have a sufficient complement of personnel with an appropriate degree of accounting knowledge and experience to appropriately analyze, record and disclose accounting matters commensurate with our accounting and reporting requirements and lacked related internal controls necessary to satisfy our accounting and financial reporting requirements. This material weakness contributed to the following additional material weaknesses:

- We did not design or maintain effective controls over risk assessment, including designing and maintaining formal accounting policies, procedures, and controls over significant accounts and disclosures to achieve complete, accurate and timely financial accounting, reporting and disclosures, including with respect to revenue and receivables, inventory, equity and derivative liabilities, and period-end financial reporting.

- We did not design or maintain effective controls over information technology ("IT") general controls for information systems that are relevant to the preparation of its financial statements. Specifically, we did not design and maintain: (i) program change management control for financial systems relevant to our financial reporting to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately; (ii) user access controls to ensure appropriate segregation of duties and that adequately restrict user and privileged access to financial applications, programs, and data to appropriate our personnel; (iii) computer operations controls to ensure critical data interfaces between systems are appropriately identified and monitored, data backups are authorized and monitored, and restorations are tested; and (iv) testing and approval controls for program development to ensure that new software development is aligned with business and IT requirements.

The material weaknesses related to the control environment and risk assessment resulted in adjustments to several accounts and disclosures in the December 31, 2020, 2019 and 2018 annual and the March 31, 2021, September 30, 2020 and 2019 quarterly financial statements. The IT deficiencies did not result in an adjustment to the financial statements; however, the deficiencies, when aggregated, could impact maintaining effective segregation of duties, as well as the effectiveness of IT-dependent controls (such as automated controls that address the risk of material misstatement to one or more assertions, along with the IT controls and underlying data that support the effectiveness of system-generated data and reports) that could result in misstatements potentially impacting all financial statement accounts and disclosures that would not be prevented or detected. Additionally, each of these material weaknesses could result in a misstatement of account balances or disclosures that would result in a material misstatement to the annual or interim condensed consolidated financial statements that would not be prevented or detected.

31.     The above statements identified above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. The Company failed to disclose to investors: (i) that the Company had not properly accrued

warranty costs related to its product; (2) that there was a material weakness in the Company's internal controls over accounting and financial reporting related to warranty accrual; (3) that, as a result, the Company's financial results for prior periods were misstated; and (4) that, as a result of the foregoing, the Company's positive statements about its business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**THE TRUTH EMERGES**

32.     On August 16, 2021, the Company announced that it "began an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual." In a Form 12b-25 filed with the SEC, the Company stated:

> View, Inc. (the "Company") is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the three and six months ended June 30, 2021 ("Second Quarter 10-Q") within the prescribed time period because it requires additional time to complete the investigation described below. The Company is currently unable to predict when it will be able to file its Second Quarter 10-Q, and does not currently expect to file by the extended filing date pursuant to Rule 12b-25.

> The Audit Committee of the Company's Board of Directors ("Audit Committee") recently began an independent investigation concerning the adequacy of the Company's previously disclosed warranty accrual. The investigation is ongoing, and the Audit Committee continues to work diligently with independent counsel and advisors to complete the investigation as soon as possible. The Company cannot predict the duration of the investigation, eventual scope, its outcome, or its impact on the Company's financial results or the Company's assessment of its internal control over financial reporting for prior periods. ***As a result, the Company has not finalized its financial statements or its assessment of the effectiveness of its disclosure controls and procedures and internal control over financial reporting for the three and six months ended June 30, 2021***. The Company expects that it will finalize its financial statements and file the related Second Quarter 10-Q as soon as practicable after the conclusion of the investigation. [Emphasis added].

33.     On this news, the Company's share price fell $1.26, or over 24%, to close at $3.92 per share on August 17, 2021, on unusually heavy trading volume.

34.     On November 9, 2021, the Director Defendants caused the Company to file a Form 8-K with the SEC (the "11/9/21 Form 8-K") and announced the results of its investigation first reported on August 16, 2021.  The 11/9/21 Form 8-K stated:

> As previously reported on August 16, 2021, the Audit Committee of the Board of Directors (the "Audit Committee") of View, Inc. ("View" or the "Company") commenced an independent investigation concerning the adequacy of the Company's previously reported warranty accrual. The investigation is now substantially complete and the Audit Committee has made its findings. Specifically, the Audit Committee has concluded that (i) the Company's previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were materially misstated, (ii) the Company's now former Chief Financial Officer and certain former accounting staff negligently failed to properly record the liabilities for warranty-related obligations and cost of revenue, and (iii) the Company's now former Chief Financial Officer and certain former accounting staff intentionally failed to disclose certain information to the Board of Directors and the Company's independent registered public accounting firm, Pricewaterhouse Coopers LLP ("PwC"), regarding the applicable costs incurred and expected to be incurred in connection with the warranty-related obligations.
>
> Furthermore, on November 3, 2021, the Audit Committee, after consultation with PwC, concluded that the following financial statements of the Company should no longer be relied upon and will require restatement: (a) the audited consolidated financial statements of View Operating Corporation (formerly known as View, Inc.) as of December 31, 2020 and 2019, and for the years then ended, (b) the unaudited condensed consolidated financial statements of View Operating Corporation as of September 30, 2020 and December 31, 2019, and for the nine months ended September 30, 2020 and 2019, (c) the unaudited pro forma condensed combined financial information of the Company as of December 31, 2020, and for the nine months then ended and for the twelve months ended March 31, 2020, and as of September 30, 2020 and for the six months then ended, and (d) the unaudited condensed consolidated financial statements of the Company as of March 31, 2021 and December 31, 2020 and for the three months ended March 31, 2021 and 2020. These financial statements are contained within one or more of the following filings with the Securities and Exchange Commission (the "SEC"): the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2021 filed on May 17, 2021, its Registration Statement on Form S-1 filed on April 7, 2021, its Current Report on Form 8-K filed on March 12, 2021, CF Finance Acquisition Corp. II's Prospectus filed pursuant to Rule 424(b)(3) on February 16, 2021, and CF Finance Acquisition Corp. II's Registration Statement on Form S-4 filed on December 23, 2020, as amended on January 26, 2021 and February 11, 2021.

The Company's warranty-related obligations that were the subject of the Audit Committee investigation arise out of standard warranties that assure that the Company's insulated glass units, or IGUs, will be free from defects in materials and workmanship generally for ten years. The Audit Committee, in consultation with management, concluded that the recorded liabilities associated with all of the Company's warranty-related obligations and the associated cost of revenue were materially misstated because, when estimating these liabilities, the Company inappropriately excluded from these liabilities certain costs it intended to incur when replacing the IGUs. The Company has also determined that offsetting this misstatement was an overestimate in the estimated failure rates of the impacted IGUs. Subject to further review by management, the Company anticipates that when it finalizes and restates its historical financial statements, the corrected liabilities associated with its warranty-related obligations will be in the range of approximately $46 million to $70 million, $38 million to $55 million and $40 million to $58 million as of December 31, 2019, December 31, 2020 and March 31, 2021, respectively. These ranges reflect the Company's estimates of its obligations over the course of the ten-year warranty periods, and are based on management judgments, statistical model and contemporaneous information. PwC has not to date performed any audit or review procedures on the investigation or management's estimate of the restated liabilities for warranty-related obligations for any period.

35.     In the 11/9/21 Form 8-K, the Company also announced, "[i]n connection with the internal investigation findings, Vidul Prakash resigned as Chief Financial Officer of the Company, effective November 8, 2021."

36.     On this news, the Company's share price dropped from its November 9, 2021 closing share price of $6.40 to close at $5.63 per share on November 10, 2021, on unusually heavy trading volume.

## DUTIES OF THE DIRECTOR DEFENDANTS

37.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control

and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

38.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

39.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial

reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

40.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

41.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

42.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Director Defendants.

43.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

44.     During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Mulpuri, Gormly, Hughes, Leppert, Cosgrove, Picard and Larson-Greene.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

45.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

46.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

47.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the

Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

48.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

49.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Mulpuri**

50.     Because of his CEO management position with the Company, Defendant Mulpuri is not independent.

51.     The Company provides Defendant Mulpuri with his principal occupation, and he receives handsome compensation for his services.  Defendant Mulpuri was responsible for most of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on.

52.     Defendant Mulpuri is also a Defendant in the securities class actions entitled *Mehedi v. View, Inc., et al.*, Case 5:21-cv-06374-BLF (N.D. Cal.) (the "Securities Class Action") and faces a substantial likelihood of liability; therefore, demand on Defendant Mulpuri is futile.

**Defendant Hughes**

25

53.     On November 8, 2021, Defendant Hughes was appointed as Executive Chair of the Company.   Defendant Hughes will assist the Chief Executive Officer.   As Executive Chair, Defendant Hughes is an employee of the Company and also functions as the Company's principal executive officer and Board Chair.

54.     The Company provides Defendant Hughes with his principal occupation, and he receives handsome compensation for his services; therefore, demand on Defendant Hughes is futile.

**Defendants Hughes, Leppert and Gormly**

55.     Defendants Hughes, Leppert and Gormly served as members of the Audit Committee during the Relevant Period. Pursuant to the Audit Committee Charter, the Audit Committee Defendants were responsible for, *inter alia*, the effectiveness of the Company's internal controls, the integrity of its financial statements, and aspects of risk management and legal and regulatory compliance that may affect the Company's financial reporting.   Defendants Hughes, Leppert and Gormly failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter and to issue false and misleading financial statements with the SEC. Thus, Defendants Hughes, Leppert and Gormly breached their fiduciary duties, are not disinterested, and demand is excused as to them.

### COUNT I

**(Against Defendants Mulpuri and Prakash For Violations Of
Sections 10(b) And 21D Of The Exchange Act)**

56.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

57.     The Company and certain officers of the Company are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of

Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Action for these violations of law, the Company's liability will be in whole or in part due to Defendants Mulpuri and Prakash willful and/or reckless violations of their obligations as officers and directors of the Company.

58.     Moreover, through their positions of control and authority as officers of the Company, Defendants Mulpuri and Prakash were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Actions and herein.

59.     As such, Defendants Mulpuri and Prakash are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

## COUNT II

### (Against The Director Defendants For Breach Of Fiduciary Duty)

60.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

61.     The Director Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

62.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

63.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their

fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

64.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

65.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## <u>COUNT III</u>

### <u>(Against The Director Defendants For Waste Of Corporate Assets)</u>

66.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

67.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

68.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful actions.

69.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

70.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 6, 2021

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
Facsimile: (302) 397-2557
Email: rernst@bk-legal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*